# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL CASE NO: 3:08-CV-507-GCM-DCK

| | |
|---|---|
| PAUL D. CARTY, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | **MEMORANDUM AND** |
| WESTPORT HOMES OF NORTH ) | **RECOMMENDATION** |
| CAROLINA, INC., WNPC ) | |
| DEVELOPMENT, LLC, ) | |
| JOHN B. SCHEUMANN, ) | |
| STEVEN M. DUNN, and ) | |
| CHARLES D. SCHEUMANN, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**THIS MATTER IS BEFORE THE COURT** on the "Motion to Dismiss" (Document No. 25) filed by Westport Homes of North Carolina, Inc. ("Westport") and WPNC Development, LLC (WPNC) (collectively "Corporate Defendants") and the "Motion to Dismiss" (Document No. 27) filed by John B. Scheumann, Steven M. Dunn, and Charles D. Scheumann (collectively "Individual Defendants"). Paul Carty ("Plaintiff") opposes the motions. This matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. §636(b), and is ripe for disposition.

Having carefully considered the record, including the briefs and related filings, the arguments of counsel at a motions hearing, and applicable authority, the undersigned will respectfully recommend that the motions be <u>granted</u>.

## I. BACKGROUND

On October 6, 2008, Plaintiff filed his "Verified Complaint" (Document No. 1-1) against Westport, WPNC, John B. Scheumann, Steven M. Dunn, and Charles D. Scheumann (all together "Defendants") in Mecklenburg County Superior Court. On November 6, 2008, Defendants timely

removed this case to the United States District Court for the Western District of North Carolina. (Document No. 1). On December 11, 2008, both Corporate Defendants and Individual Defendants filed a "Motion to Dismiss" (Document Nos. 7 & 9). "Plaintiff's Memorandum Of Law..." (Document No. 16) in opposition to the Individual Defendants' motion to dismiss was filed on January 16, 2009. "Plaintiff's Memorandum Of Law..." (Document No. 22) in opposition to the Corporate Defendants' motion to dismiss was filed on January 21, 2009. On January 16, 2009, Plaintiff filed his "First Verified Amended Complaint" (Document No. 17) ("Complaint"). [1]

The Corporate and Individual Defendants filed renewed motions to dismiss (Document Nos. 25 & 27) on February 3, 2009. The Individual Defendants originally moved to dismiss the Plaintiff's claims pursuant to both Rule 12(b)(2) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Document No. 27). Following Plaintiff's response to the motions, Defendants replied and filed a "Notice of Subsequent Authority" (Document No. 31) and withdrew their argument for dismissal for lack of personal jurisdiction under Rule 12(b)(2). (See Document Nos. 31 and 36, p.3, fn.2). The remaining portions of the Defendants' motions to dismiss (Document Nos. 25 & 27) pursuant to Rule 12(b)(6) are now before the Court. As it must when considering a motion to dismiss pursuant to Rule 12(b)(6), the Court will assume that the factual allegations contained in the Complaint are true.

It is alleged that the Individual Defendants recruited the Plaintiff who then entered into a Shareholder's Agreement (Document Nos. 17-5 & 17-6) with them on or about September 1, 2004. (Document No. 17, ¶ 10). According to Plaintiff, pursuant to the Shareholder's Agreement, Plaintiff

---

[1] Defendants' original motions to dismiss (Document Nos. 7 & 9) were ultimately denied without prejudice as moot, based on the subsequent filing of an amended complaint. (See Document Nos. 37 & 39).

owned an interest as a minority shareholder in Westport and served as an Officer and Director of that corporation. (Document No. 17, ¶¶10,12).

The Shareholders Agreement provided, *inter alia*, that Westport had "the option to Purchase all or a portion of his, her or its Shares in the event he or she ceases for any reason to be an employee of the Corporation..." and anticipated the possibility of "a repurchase triggered by the termination of employment." (Document No. 17-5). The Shareholders Agreement also provided in Section 3.03, Payment of Purchase Price that:

> The Corporation shall have the right and option to pay ... either in full cash ... or on the following terms and conditions: an amount equal to twenty percent (20%) of the Purchase Price at the Closing, with the Corporation's obligation to pay the remaining balance of the Purchase Price to be evidenced by the Corporation's negotiable promissory note ... which shall: ... (ii) bear interest upon the unpaid principal balance at an annual rate equal to Prime Rate plus five percentage (5%) points . . . (vi) be subordinated to all debts and liabilities that are owed by the Corporation to a third party.

(Document No. 17-5).

Shortly after entering into the Shareholders Agreement, Plaintiff also entered into an Operating Agreement, on or about September 29, 2004, with the Individual Defendants. (Document No. 17-7 – 17-12). Pursuant to the terms of the Operating Agreement, Plaintiff owned an interest as a minority member in WPNC and served as a member and manager of WPNC. (Document No. 17, ¶¶ 13-15). Notably, the Operating Agreement provides in Section 6.05 that "Members holding an eighty percent (80%) supermajority of the Voting Interest may remove the Manager with or without cause. (Document No. 17-8). In addition, Section 9.09 of the Operating Agreement described the options of the Company in purchasing from a selling Member as either "in full cash at Closing" or

> an amount equal to twenty percent (20%) of the Purchase Price at the Closing, with the Company's obligation to pay the remaining balance of the Purchase Price to be evidenced by the Company's negotiable promissory note ... which shall: . . . (ii) bear interest upon the unpaid principal balance at an annual rate equal to Prime Rate plus five percentage (5%) points . . . (vi) be subordinated to all debts and liabilities that are owed by the Company to a third party.

(Document No. 17-10).

In varying roles, Plaintiff, Corporate Defendants, and Individual Defendants all worked in conjunction with one another to develop residential real estate projects in North Carolina. (Document No. 17, ¶14). This work took the form of ownership of real property and the construction of new residences and residential projects on that real property. Id. Pursuant to the agreements, Plaintiff owned an approximate fifteen (15%) interest in both Westport and WPNC. (Document No. 17, ¶15). The remaining majority interest (collectively 85%) in Westport and WPNC was held by the Individual Defendants.

On or about December 14, 2006, in their capacity as majority shareholders of Westport and majority members of WPNC, the Individual Defendants met to execute a number of important documents regarding Westport and WPNC. Plaintiff was given no prior notice of the December 14, 2006 meeting.

At this December 14, 2006 meeting, the Individual Defendants executed the following documents regarding Westport:

i. Written Consent of the Shareholders of Westport Homes of North Carolina, Inc. To Action Without a Meeting
ii. Joint Unanimous Written Consent of the Board of Directors and the Shareholders of Westport Homes of North Carolina, Inc. To Action Without Meeting
iii. First Amendment To Shareholders Agreement

(Document No. 17, ¶ 19; see also Document Nos. 17-16 – 17-18).

The Shareholders Agreement provides in pertinent part, Section 6.02, that it "may be amended by a writing or modified from time to time only by a written instrument approved by the Shareholders holding two thirds (2/3) of the Shares then outstanding." (Document No. 17 - 6).

Also during the December 14, 2006 meeting, the Individual Defendants executed the following documents regarding WPNC:

i. Written Consent of the Members Holding Of WPNC Development, LLC to Action Without Meeting
ii. Majority Written Consent of the Board of Managers and the Member of WPNC Development, LLC To Action Without Meeting
iii. First Amendment to Operating Agreement

(Document No. 17, ¶ 18; see also Document Nos. 17-13 – 17-15).

Similar to the Shareholders Agreement, the Operating Agreement also contains a provision allowing for amendment. (Document No. 17-10). Section 12.02 of that document provides that "[a]ny amendment to the Articles or this Agreement must be approved in writing by those Members holding a majority of the Voting Interest." Id.

Plaintiff alleges that the net result of the actions taken by the Individual Defendants on December 14, 2006 was the deprivation of Plaintiff's rights in Westport as a Shareholder and Director and in WPNC as a Manager and Member. (Document No. 17, ¶ 21). Plaintiff alleges that the result of these actions by the Individual Defendants was also the alteration of the terms by which Westport and WPNC must compensate a shareholder or member in the event of an involuntary transfer, reducing that compensation. (Document No. 17, ¶ 22) Specifically, it appears that the Individual Defendants changed the annual rate of interest on an unpaid balance due under a promissory note from "Prime Rate plus five percentage (5%) points" to "eight percent (8%)." (Document No. 17, ¶ 22; also compare Document Nos. 17-5 and 17-10 with Document Nos. 17-15 and 17-18). The Complaint does not appear to challenge the propriety of the amendment process.

5

On December 21, 2006, Corporate Defendants issued a letter, "Re: Notice of Buyout and Release" to the Plaintiff. (Document No. 17, ¶ 23; see also Document No. 17-19). In that letter, Westport and WPNC confirmed their termination of Plaintiff pursuant to the various resolutions set forth on December 14, 2006, and otherwise set forth the terms of Plaintiff's transfer of his membership interest of shares in the Corporate Defendants. (Document No. 17, ¶ 24). The Buyout and Release noted that as of November 30, 2006, the purchase price for Plaintiff's shares was valued at $187,827.00 for his interest in WPNC, and $768,516.00 for his interest in Westport. (Document No. 17-19). The terms of payment in the Buyout and Release provided that 20% of the purchase price would be paid in cash at closing, and the remaining balance would be paid by a negotiable promissory note. (Document No. 17-19). The Notice of Buyout and Release was signed by Steven M. Dunn for WPNC and Westport, and by Plaintiff. (Document No. 17-19).

It is further alleged that the Individual Defendants coerced Plaintiff into executing additional documents on or about January 2, 2007 – namely a Termination Agreement, a WPNC Development, LLC 8% Promissory Note ("WPNC Note"), and a Westport Homes of North Carolina, Inc. 8% Promissory Note ("Westport Note"). (Document No. 17, ¶ 25; see also Document Nos. 17-20 – 17-22). The Plaintiff contends that the Individual Defendants represented to him that he would be deprived of all his rights under the various agreements previously entered into by the parties unless he executed these additional documents. (Document No. 17, ¶ 25). The Plaintiff alleges that this was a "take it or leave it" proposition, with no opportunity to have the documents reviewed by counsel and no opportunity to fully consider the terms. Id. Pursuant to the Termination Agreement effective January 2, 2007, Plaintiff received $75,000.00 as a termination payment, and in consideration for that payment agreed to "release, and waive any and all claims, actions, causes of

action or demands against the Companies and agree[d] to the provisions of th[e] Agreement." (Document No. 17-20).

The WPNC Note is for the principal amount of $150,261.00 and provides for eight percent (8%) interest per annum. (Document No. 17-21). The Westport Note is for the principal amount of $614,812.00, and also provides for eight percent (8%) interest per annum. Both promissory notes included a Subordination clause stating:

> the payment of the principal of and interest on this Note shall be subordinated in right of payment . . . to the prior payment in full of all debt, including debt owed to John B. Schuemann. . . . Holder agrees not to exercise any rights hereunder until the Scheumann Note is paid in full.

(Document No. 17-21 & 17-22). This language is consistent with the terms of the Operating Agreement cited above – "the Company's negotiable promissory note ... which shall: . . . (vi) be subordinated to all debts and liabilities that are owed by the Company to a third party." (Document No. 17-10).

On April 14, 2007, the Plaintiff received a shareholder's K-1 from Westport for the 2006 calendar year. (Document No. 17, ¶ 28). Purportedly, Westport assigned corporate income to the Plaintiff for the month of December 2006 in the amount of $107,101.00, thereby imposing tax liability on him for income he never received. Id. Plaintiff further asserts that the 2006 Westport K-1 claims distributions to the Plaintiff in excess of $79,647.00 more than were actually made to Plaintiff during the calendar year. Id. Plaintiff also contends that WPNC likewise issued a K-1 for the 2006 calendar year which assigned tax liability to the Plaintiff for the month of December 2006, despite the Plaintiff having derived no financial benefit nor income from WPNC during that month. (Document No. 17, ¶ 29). Plaintiff claims that the Corporate Defendants "knowingly and intentionally overstated Carty's distributions for the 2007 calendar year by approximately

7

$150,000.00" thereby subjecting him to additional tax liability and creating a benefit to Defendants. (Document No. 17, ¶ 41). Allegedly, Westport and WPNC have refused to take any corrective action on these issues. (Document No. 17, ¶ 30). Plaintiff contends he has incurred substantial tax liability and damages as a result of Defendants' actions regarding the K-1s. (Document No. 17, ¶¶ 28 & 41).

Plaintiff's Complaint also charges that he has not yet been paid by Defendants pursuant to the terms of the promissory notes referred to above. (Document No. 17, ¶¶ 32-33). Defendants have purportedly informed him that they will not make any payments pursuant to either promissory note, invoking certain subordination language within the Agreements. (Document No. 17, ¶ 34).

Based on the aforementioned facts, the Plaintiff includes in his Complaint causes of action for breach of contract; unjust enrichment; constructive fraud; breach of fiduciary duty; unfair and deceptive trade practices; tortious interference with contract; and economic duress. The question before the Court is whether these causes of action survive the Defendants' Rule 12(b)(6) motions to dismiss under the prevailing standard. For the reasons stated below, the undersigned respectfully recommends that these motions be <u>granted</u>.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992); <u>Eastern Shore Markets, Inc v. J.D. Assoc. Ltd. Partnership</u>, 213 F.3d 175, 180 (4th Cir. 2000). A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1960 (2009), quoting <u>Twombly</u>, 550 U.S. at 570; see also <u>Robinson v. American Honda Motor Co., Inc.</u>, 551

F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

The Supreme Court has also opined that

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(citations omitted).

"Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The court "should view the complaint in the light most favorable to the plaintiff." Mylan Labs, Inc. v. Matkar, 7 F.3d 1130, 1134 (4th Cir. 1993).

### III. DISCUSSION

**A. Breach of Contract**

Plaintiff's first and second causes of action are for breach of contract regarding the WPNC Note and the Westport Note. (Document No. 17, ¶¶ 43-58). Plaintiff contends that Corporate Defendants are in breach of the terms of the promissory notes by virtue of their failure to tender payment to Plaintiff of the principal amounts owed, on or before January 2, 2008. (Document No. 17, ¶¶ 49, 57). Plaintiff's Complaint alleges that Corporate Defendants refuse to tender payment based on "unenforceable terms of the Subordination Provision[s] in the Note[s] and on the

9

fraudulent, coerced and equally unenforceable 'Payment and Release' clause of the Termination Agreement." (Document No. 17, ¶¶ 46, 54). Plaintiff argues that the subordination provisions of the promissory notes are unenforceable as vague, undefined, unsupported by consideration and unconscionable. (Document No. 17, ¶¶ 47, 55). Essentially, Plaintiff seeks to have the Court deem that the promissory notes are unenforceable as to the subordination provision, but otherwise valid and enforceable, and therefore, based on the severability provisions, require full payment of the principal amounts. (Document No. 17, ¶ 48).

There appears to be no dispute that Indiana law governs these promissory notes. Defendants contend that pursuant to Indiana law "[t]he construction of a written contract is a question of law" and that motions to dismiss are therefore an appropriate mechanism for courts to resolve breach of contract claims. (Document No. 26 at p.8, quoting First Nat'l Bank & Trust v. Indianapolis Public Housing Agency, 864 N.E.2d 340, 350 (Ind.Ct.App. 2007). Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." American Family Mut. Ins. Co. v. Matusiak, 878 N.E.2d 529, 533 (Ind.Ct.App. 2007) citing Rogier v. Am. Testing and Eng'g Corp., 734 N.E.2d 606, 614 (Ind.Ct.App. 2000).

Defendants argue that Plaintiff's request to invalidate specific provisions of the promissory notes does not constitute a breach of contract claim. (Document No. 26 at p.9). Defendants contend that Plaintiff has not alleged that they breached a contractual obligation. Id.

> When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties. This requires that the contract be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. When the language of a contract is clear and unambiguous, the intent of the parties is determined from

> the four corners of the instrument. In such a situation, the terms are
> conclusive and we will not construe the contract or look at extrinsic
> evidence, but will merely apply the contractual provisions.

First Nat'l Bank & Trust, 864 N.E.2d at 350 citing Boonville Convalescent Center, Inc. v. Cloverleaf Healthcare Services, Inc., 834 N.E.2d 1116, 1121 (Ind.Ct.App. 2005)(internal citations omitted).

The undersigned finds the language of the contracts, including the subordination provisions, clear and unambiguous. Plaintiff contends that the subordination provisions do not "define *in any way* the debt to which Plaintiff's rights are subordinated." (Document No. 30 at p.3)(emphasis in original). The undersigned respectfully disagrees. The subordination provision allows that "the payment of the principal of and interest on this Note shall be subordinated in right of payment . . . to the prior payment in full of all debt, including debt owed to John B. Scheumann. (the "Schuemann Note")." (Document Nos. 17-21 & 17-22) Granted, "all debt" is not clearly defined; however, the document is very clear that payment is, at a minimum, subordinated to the debt owed Scheumann - specifically pursuant to a Schuemann Note. See Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed.R.Civ.P., the exhibit prevails.").

Plaintiff does not allege that all debt has been paid or even that all of the Scheumann debt has been paid. If Plaintiff were alleging that the Companies had paid their debts, to Scheumann and otherwise, and still refused to pay the principal owed, this might be a closer call. As it stands, Plaintiff has not identified facts to support a breach of contract claim because the condition precedent in the contracts has not been satisfied; rather he seeks to have terms of agreements he does not like nullified by the Court.

It is worth further note that the terms of the subordination provisions in the promissory notes are not only consistent with the Shareholders Agreement and Operating Agreement's subordination

language, but the promissory notes are even more specific in identifying the debt Plaintiff's payment is subordinated to. To the undersigned's knowledge, Plaintiff has never alleged that the Shareholders and Operating Agreements he executed in September 2004, regarding subordination or other provisions, are vague, undefined, unsupported by consideration, unconscionable, or somehow constitute a breach.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949. Plaintiff's claims are conclusory, inconsistent with the plain language of the documents he has attached as exhibits, and simply fail to identify the essential element of the cause of action – a breach. As such, Plaintiff's Complaint does not suffice to support causes of action for breach of contract.

### B. Termination Agreement - Release Provision

In an alternative argument, Defendants contend that Plaintiff's remaining claims should be dismissed as they are in violation of the Termination Agreement's release provision. (Document No. 17-20). In consideration for payment of $75,000.00, Plaintiff agreed to "release and waive any and all claims, actions, causes of action or demands against the Companies and agree[d] to the provisions of this Agreement." (Document No. 17-20). Defendants argue that it is well established that "a party may not claim the benefits under a transaction or instrument and, at the same time, repudiate its obligations." Raymundo v. Hammond Clinic Assoc., 449 N.E.2d 276, 283 (Ind. 1983). Defendants further contend that at a minimum Plaintiff would be required to return the $75,000.00 he received, as well as interest payments, before proceeding with his claims, and that to date he has refused.

Defendants' counsel at the hearing made the argument that Plaintiff may actually be in a better position due to his termination than he would be if he were still involved with the companies.

12

It was then offered that "if Mr. Carty would like to set aside the deal and pay back the money he's received today, they'd be happy to reinstate him as an owner with the full equity that he had received before and get him back on the personal guarantee and then they can all share in that risk."

Although Defendants make an interesting and compelling argument that the terms of the release may justify dismissal of the remaining claims, the undersigned will individually address the fundamental flaws of each claim which warrant dismissal.

### C. Unjust Enrichment

The Complaint's third cause of action alleges a claim for unjust enrichment against all Defendants. (Document No. 17, ¶¶ 59-65). Specifically, Plaintiff contends that Defendants knowingly and intentionally overstated and exaggerated distributions made to him for the 2006 and 2007 calendar years, as evidenced by various K-1 documents. (Document No. 17, ¶ 60).

> The law of unjust enrichment in North Carolina proceeds from the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Booe v. Shadrick, 322 N.C. 567, 369 S.E.2d 554, 555-56 (1988) (internal quotations omitted). In order to prevail on a claim for unjust enrichment, a plaintiff must prove that (1) **it conferred a benefit on the defendant**, (2) the benefit was not conferred officiously or gratuitously, (3) the benefit is measurable, and (4) the defendant consciously accepted the benefit. Id. at 556. An unjust enrichment claim is **available only in the absence of an express contract** between the parties. Id.

Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 Fed.Appx. 916, 920 (4th Cir. 2003) (emphasis added); see also, Fireman's Fund Ins. Co. v. Safeco Ins. Co., 3:07-CV-86-GCM, 2007 WL 4233317 (W.D.N.C. November 28, 2007).

As an initial matter, there were express contracts between the parties which would arguably moot this claim. Additionally, the undersigned is persuaded that Plaintiff's Complaint does not adequately allege that he conferred a benefit on Defendants. Defendants argue that Plaintiff does

13

not allege that he paid tax liability owed by any Defendant, nor show any other way that his actions conferred a benefit on Defendants. (Document No. 26 at p.14-15). Accepting the allegations as true – that Plaintiff incurred substantial tax liability which misstated or inflated his earnings, and which caused him to incur damages – does not necessarily support the claim that he conferred a benefit on all Defendants. (Document No. 17, ¶ 31).

Plaintiff fails to state sufficient facts to support a claim to relief that is plausible on its face. As such the undersigned will recommend that this cause of action be dismissed.

### D. Constructive Fraud

Plaintiff's fourth cause of action is for constructive fraud against Individual Defendants. (Document No. 17, ¶¶ 66-72). Counsel for the Defendant argued at the motions hearing that there "can't be any fraud because there can't be any detrimental reliance because the parties are enforcing an agreement that existed since 2004, and there's nothing in the Complaint that alleges that any fraud occurred in 2004. Once the fraud claims are out and the breach of contract claim is out, then all of the other claims fall by the wayside." (Hearing, June 16, 2009, Mr. McNally).

The Complaint alleges that the Individual Defendants "made material misrepresentations regarding the Subordination Clause of each Note and regarding the intent and ability of Defendant Westport and Defendant WPNC to honor the payment terms...." (Document No. 17, ¶ 68). However, as noted above, the language of the subordination provisions in the promissory notes is entirely consistent with the Shareholders Agreement and Operating Agreements executed in 2004. Furthermore, Plaintiff has not alleged that the condition precedent to his payment on the Notes has been met. The plain language of Plaintiff's exhibits belie his claim that Defendants have taken advantage of a position of trust or deceived him – it is clear the terms he complains of were established and agreed to in September 2004. His claim that Individual Defendants made "material

misrepresentations" and/or "remained silent" regarding their intentions "to honor the payment terms" ring hollow in the face of earlier documents that clearly stated the intention to withhold full payment until all debts were paid. (Document No. 17, ¶ 68).

Plaintiff has thus failed to state a plausible claim for constructive fraud upon which relief may be granted.

### E. Breach of Fiduciary Duty

In his fifth cause of action, Plaintiff alleges breach of fiduciary duty against the Individual Defendants. (Document No. 17, ¶¶ 73-78). Plaintiff contends that the Individual Defendants "acted in a manner so as to benefit themselves at the expense of Plaintiff Carty . . . resulting in Carty being oppressively forced from ownership in Defendant Westport and Defendant WPNC and coerced into executing documents which contained terms which have caused him further economic harm." Id. at ¶ 75.

Once again, accepting the Complaint's factual allegations as true and viewing the Complaint in the light most favorable to Plaintiff, the undersigned finds that Plaintiff fails to state a claim upon which relief can be granted. Plaintiff has not pled factual content that would allow the Court to draw the reasonable inference that Defendants are liable for the alleged misconduct. See Iqbal, 129 S.Ct. at 1949. Specifically, weighing the allegations of the Complaint with its exhibits, which include the documents referenced in this claim, the undersigned does not find it plausible that Defendants breached their fiduciary duty by taking actions that were allowed and anticipated by the Operating and Shareholders Agreements executed in September 2004, and which are consistent with the promissory notes and Termination Agreement executed in December 2006 and January 2007.

The allegation of coercion is also not plausible on its face where the facts presented by Plaintiff show that he received, acknowledged and agreed to terms in the Notice of Buyout and

15

Release on or about December 21, 2006, and then almost two weeks later executed the Termination Agreement and promissory notes. The timing of those events suggests adequate opportunity to object to the proposed terms and/or to consult with counsel and does not support Plaintiff's conclusory statements alleging coercion or oppression.

### F. Unfair and Deceptive Trade Practices

Plaintiff's sixth cause of action is brought against all Defendants alleging unfair and deceptive trade practices. (Document No. 17, ¶¶ 79-85). Plaintiff contends that Defendants' acts or omissions are prohibited by the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, et seq. (Document No. 17, ¶ 80). To state a claim, a plaintiff must establish that (1) the defendant "committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001); see also, Freeman v. Duke Power Co., 114 Fed. Appx. 526, 535 (4th Cir. 2004).

Plaintiff's allegations, taken as true, are that Defendants breached their contracts with him by failing to make timely payments and that they issued K-1's that over-stated his income. "It is well established that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under G.S. section 75-1.1." Branch Banking and Trust Co. v. Thompson, 107 N.C.App. 53, 62, 418 S.E.2d 694, 700, (1992) disc. review denied, 332 N.C. 482, 421 S.E.2d 350 (1992). Moreover, a Plaintiff must state that the alleged actions had an affect "on commerce outside of the parties' employment relationship." Fotiadis v. Quality Systems, Inc., 3:06-CV-317-GCM (W.D.N.C. March 8, 2007) citing Durling v. King, 146 N.C. App. 483, 554 S.E.2d 1 (2001).

Plaintiff's Complaint does allege that the "acts or omissions were in or affecting commerce, outside and beyond the contractual relationships between the parties, because they affected the larger community's real estate market and related businesses...." (Document No. 17, ¶ 82). However, the facts alleged, including the attached exhibits, do not support the claim that the alleged conduct by Defendants had an affect on commerce beyond the employment relationship. Whether or not Defendants have breached the terms of the promissory notes, or misstated income on K-1's, would not have the affect on commerce envisioned by the UDTPA.

> N.C. Gen. Stat. § 75-1.1 was not meant to encompass all business activities or all wrongdoings in a business setting but "was adopted to ensure that the original intent of the statute ... was effectuated." . . . The statute initially stated its purpose as follows:
>> "[T]o provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all level[s] of commerce be had in this State."
>
> Bhatti v. Buckland, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991) (quoting N.C. Gen. Stat. § 75-1.1 (1975)).

Wilson v. Blue Ridge Elec. Membership Corp., 157 N.C.App. 355, 357-58, 578 S.E.2d 692, 694 (2003)(internal citations omitted). Furthermore, most employer-employee disputes and matters of internal corporate management are beyond the scope of the UDTPA. Dalton v. Camp, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001); In re Brokers, 396 B.R. 146, 162-63 (Bankr. M.D.N.C. 2008).

The undersigned finds Plaintiff's statements in support of this cause of action are conclusory and do not state sufficient factual content to support a claim that is facially plausible.

**G. Tortious Interference with Contract**

The sixth cause of action is for tortious interference with contract and is brought against the Individual Defendants. (Document No. 17, ¶¶ 86-93). Plaintiff contends that one or more of the Individual Defendants induced one or both of the Corporate Defendants not to perform the contract(s) they entered into with Plaintiff. (Document No. 17, ¶ 90). The allegation depends on a presumption that the Corporate Defendants failed to perform, or breached, their contract(s) with Plaintiff. As noted above, the undersigned does not find that Plaintiff has stated a plausible claim for breach - particularly where key conditions precedent to the fulfillment of the contract terms have not yet been met. Therefore, Plaintiff's claim again conflicts with the plain language of the exhibits filed with the Complaint and fails to state a claim to relief that is plausible on its face. As such this claim should also be dismissed.

**H. Economic Duress**

Plaintiff's eighth and final claim is for "economic duress." (Document No. 17, ¶¶ 94-99). Defendants have argued that there is no such cause of action under either North Carolina or Indiana law. When the undersigned inquired during the motions hearing as to whether economic duress is a cause of action or a defense, Plaintiff's counsel responded that "if economic duress is unrecognized in Indiana, we're proceeding here in a good faith belief that a change in the law should be made as regards this particular matter." (Hearing, June 16, 2009, Mr. Kearney).

The undersigned is not persuaded that Plaintiff has alleged a sufficient legal or factual basis to support a plausible claim of "economic duress" and will recommend that this claim be dismissed.

**IV. CONCLUSION**

Based on the foregoing, the undersigned finds that Plaintiff has failed to allege sufficient factual content to support claims for relief that are plausible on their face and will therefore respectfully recommend that all of Plaintiff's claims be dismissed. In carefully reviewing the

18

Complaint and its attachments, the undersigned repeatedly noticed that the alleged actions of Defendants were anticipated and/or allowed by the documents Plaintiff executed in September 2004, December 2006, and January 2007. See Standard Life & Accident Ins. Co. v. Dewberry & Davis, LLC, 210 Fed.Appx. 330, 332-33 (4th Cir. 2006) citing Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed.R.Civ.P., the exhibit prevails.").

## V. RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that the Defendants' "Motion To Dismiss" (Document No. 25) and "Motion To Dismiss" (Document No. 27) should be **GRANTED**.

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact and conclusions law and the recommendations contained herein must be filed within fourteen (14) days after service of same. Fed.R.Civ.P. 72. Responses to objections must be filed within fourteen (14) days after service of the objections. Failure to file objections to this Memorandum and Recommendation with the District Court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Graham C. Mullen.

**IT IS SO RECOMMENDED**.

Signed: May 27, 2010

David C. Keesler
United States Magistrate Judge